IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ELLIOTT-LEWIS CORPORATION**<br><br>    **Plaintiff**<br><br> v.<br><br>**SKANSKA USA BUILDING, INC.**<br><br>    **Defendant** | **CIVIL ACTION<br>NO. 14-03865** |
| **SKANSKA USA BUILDING, INC.**<br><br>    **Third Party Plaintiff**<br><br> v.<br><br>**SAYLORGREGG ARCHITECTS, URBAN ENGINEERS, INC., and MARVIN WAXMAN CONSULTING ENGINEERS, INC.**<br><br>    **Third Party Defendants** | |
| **SAYLORGREGG ARCHITECTS, URBAN ENGINEERS, INC., and MARVIN WAXMAN CONSULTING ENGINEERS, INC.**<br><br>    **Fourth Party Plaintiffs**<br><br> v.<br><br>**BONLAND INDUSTRIES, INC., DELTA COOLING TOWERS, INC., SASS MOORE & ASSOCIATES, INC., PATTERSON PUMP COMPANY, CLAPP ASSOCIATES, INC, and COMPREHENSIVE TEST & BALANCING, INC.**<br><br>    **Fourth Party Defendants** | |

PAPPERT, J.                                                                                           JULY 27, 2015

## MEMORANDUM

This litigation involves a dispute regarding the installation of a new air conditioning system at the Franklin Institute in Philadelphia. Elliott-Lewis Corporation ("ELCo"), a subcontractor on the project, sued Skanska USA Building, Inc. ("Skanska"), the general contractor on the project, for unpaid work. Skanska then sued the project architects and engineers. The architects and engineers then sued a number of entities that had manufactured and supplied components for the project. Two of those entities, Patterson Pump Company ("Patterson") and Clapp Associates, Inc. ("Clapp") move to dismiss the claims against them, arguing that they are barred by the economic loss doctrine. The Court agrees and grants the motions.

**Factual and Procedural Background**

The Franklin Institute ("Franklin") underwent significant renovations in 2013. (Saylor Gregg Compl. ¶ 13, Doc. No. 25.) The renovation project included expanding the Franklin with a 54,000 square foot addition. (*Id.*). Franklin contracted with Defendant Saylor Gregg Architects ("Saylor Gregg") to design the project. (*Id.* ¶ 4.) Saylor Gregg then entered into an agreement with Defendant Urban Engineers ("Urban"), through Defendant Marvin Waxman Consulting Engineers, Inc. ("Marvin Waxman"), to provide engineering services for the project. (*Id.* ¶ 5.) Franklin separately contracted with Skanska to perform the construction work. (*Id.* ¶ 2.)

Part of the project entailed the design and installation of a new heating, ventilating, and air conditioning ("HVAC") system. (*Id.* ¶ 14.) Skanska subcontracted with ELCo to install the HVAC piping and controls. (*Id.* ¶ 16.) The project milestone for the start of the cooling season

2

was April 1, 2013.  (*Id.* ¶ 15.)  As a result, February 23, 2013 was established as the target date for the start-up of the new HVAC system.  (*Id.*)

Marvin Waxman's design for the HVAC system included a two-cell cooling tower.  (*Id.* ¶ 32.)  The design documents did not specify the exact make and model of the cooling tower to be used; that decision was left to Skanska and ElCo.  (*Id.* ¶ 33.)  Rather, the design provided the manufacturer and model number for the cooling tower that Marvin Waxman used as the basis for the design.  (*Id.* ¶ 32.)  According to the specifications, if a contractor decided not to use the product chosen as the basis for the design, the contractor had to determine whether the product it chose could meet the required performance criteria without the need to revise the specifications and enter a change order.  (*Id.* ¶ 34.)

ELCo decided not to use the cooling tower upon which the design was based.  (*Id.* ¶ 35.)  ELCo instead decided to use a four-cell cooling tower manufactured by Defendant Delta Cooling Towers, Inc. ("Delta").  (*Id.*)  Defendant Sass Moore & Associates, Inc. ("Sass Moore") was the manufacturer's representative for Delta on the project.  (*Id.* ¶ 18.)  The decision to use a four-cell cooling tower had consequences as to the HVAC piping and controls that ELCo would need to install to meet the performance criteria under the design specifications.  (*Id.* ¶ 36.)  Specifically, the water being supplied to and returning from a cooling tower must be balanced in each cell so that none of the cells overflow.  (*Id.* ¶ 37.)  The piping and equipment needed to balance a two-cell tower differs from that needed to balance a four-cell tower.  (*Id.*)

Marvin Waxman initially rejected the submission to use the Delta four-cell cooling tower.  (*Id.* ¶ 38.)  However, Skanska, ELCo, Delta, and Sass Moore met with Marvin Waxman and assured that they could configure the piping and related equipment to meet the performance

3

specifications.  (*Id.* ¶ 38.)  Based upon these representations, Marvin Waxman approved the use of the Delta cooling tower for the HVAC installation.  (*Id.* ¶ 40.)

The HVAC system was not operational at the start of the cooling season.  (*Id.* ¶ 41.)  When the system was started for testing some of the sumps in the cooling tower overflowed, flooding the roof, and the receiving tank inside the building overflowed, flooding the floor.  (*Id.* ¶ 43.)  Patterson manufactured the condenser pumps selected and installed by ELCo on the system.  (*Id.* ¶ 44.)  Clapp was the manufacturer's representative for Patterson on the project.  (*Id.* ¶ 20.)  In troubleshooting the problem with the HVAC system, Marvin Waxman used data provided by Patterson.  (*Id.* ¶ 44.)  It was ultimately determined that there were problems "intrinsic to the pumps supplied."  (*Id.*)  However, it was several weeks before Patterson admitted this, resulting in delay before the problem could be corrected.

The problems with the HVAC system required ELCo to perform additional work such as installing balancing valves and equilibrium piping.  (*Id.* ¶ 48.)  ELCo also installed temporary cooling equipment so that the Franklin could open during the summer while the permanent system was being fixed.  (Am. Compl. ¶ 16, Doc. No. 33.)  Skanska never paid ELCo for the additional work or for the cost of installing the temporary equipment.  (*Id.* ¶ 44.)

Consequently, ELCo initiated this action by suing Skanska for breach of contract.  (*Id.* ¶ 48.)  Skanska then filed a third-party complaint against Saylor Gregg, Urban, and Marvin Waxman for negligent misrepresentation, arguing that ELCo only had to do the additional work because of errors in the design drawings and specifications.  (Skanska Compl. ¶ 50, Doc. No. 12.)  Saylor Gregg, Urban, and Marvin Waxman (collectively, the "Design Defendants") then

filed a fourth-party complaint against Patterson and Clapp.[1]  The Design Defendants assert negligence claims, arguing that in drafting the design documents they reasonably relied on information provided by Patterson and Clapp and that this information was inaccurate.  Patterson and Clapp argue that the fourth-party claims against them are barred by the economic loss doctrine, and in any event, the Design Defendants have failed to allege facts sufficient to state a claim for negligence.  (*See* Motions Dismiss, Doc. Nos. 67, 69.)  They separately move to dismiss the Design Defendants' claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (*Id.*)  Because the arguments on this point are substantively identical, the Court addresses them as one.

**Legal Standard**

A Rule 12(b)(6) motion tests the sufficiency of the factual allegations in the complaint.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  When confronted with a 12(b)(6) motion, a district court must conduct a two-step analysis.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, the district court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."  *Id.* at 210-11.  Then, it "must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  When making this determination, the court can consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."  *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  The district court must "construe the complaint in the light most favorable to the plaintiff . . . ."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

---

[1] The Design Defendants also asserted fourth-party claims against Defendant Comprehensive Test & Balancing, Inc. and Bonland Industries, Inc.  Those claims are not at issue with respect to the pending motions to dismiss.

**Discussion**

Clapp and Patterson both argue that the economic loss doctrine bars the Design Defendants' negligence claims against them. Pennsylvania's economic loss doctrine precludes recovery for negligence "if the plaintiff suffers a loss that is exclusively economic, unaccompanied by an injury to either property or person." *Bouriez v. Carnegie Mellon Univ.*, 430 F. App'x 182, 187 (3d Cir. 2011). The Design Defendants do not contest that the losses they assert are purely economic and unaccompanied by an injury to either person or property. They argue, however, that the economic loss doctrine does not apply to Clapp and Patterson under *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 285 (Pa. 2005).

*Bilt-Rite* involved a public construction project. An architect prepared plans, drawings, and specifications to be submitted to contractors so that they could prepare and submit bids for the construction of a new school. *Id.* at 272. The plans and drawings expressly stated that all aspects of the construction "could be installed and constructed through the use of normal and reasonable construction means and methods, using standard construction design tables." *Id.* Once construction began, however, the winning bidder discovered that certain aspects of the project could not be completed using standard construction methods. The contractor had to use special construction methods, substantially increasing the cost of construction. As a result, the contractor sued the architect for negligent misrepresentation, seeking to recover the increased cost of construction. *Id.*

The architect argued that the contractor's claim was barred by the economic loss doctrine, but the Pennsylvania Supreme Court disagreed. *Id.* The Court turned to Section 552 of the Restatement (Second) of Torts. *Id.* at 285. Section 552 reads in relevant part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information

> for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

The Court noted that the section "sets forth the parameters of a duty owed when one supplies information to others, for one's own pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities." *Id*. at 285-86. It then adopted Section 552 "as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information." *Id*. at 287. It stated that "Section 552 imposes a duty of reasonable care upon the supplier of professional information for use by others." *Id.* The Court then ruled that the economic loss doctrine does not apply in the context of claims under Section 552. In doing so, it emphasized that "economic losses are routinely allowed in tort actions in other contexts such as legal malpractice, accountant malpractice, and architect liability." *Id.* at 288.

The Pennsylvania Supreme Court further defined the contours of a Section 552 claim in *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 843 (Pa. 2009). There, the Court refused to apply Section 552 to a utility company because it did "not engage in supplying information to others for pecuniary gain." *Id.* at 843. The Court agreed with the lower court ruling that *Bilt-Rite* applied to "professional information provider[s]." *Id.* It therefore refused to

7

apply Section 552 even though the utility company might enjoy "an economic benefit from providing accurate information about the location of its underground lines." *Id.* at 842.

Here, the Design Defendants argue that Section 552 liability and the *Bilt-Rite* exception to the economic loss doctrine apply to Clapp and Patterson. They argue that Section 552 liability can apply not only where a defendant's core business is supplying information, but also where a defendant "make[s] a misrepresentation in the course of any other transaction in which the defendant has a pecuniary interest." (Opp'n Mot. Dismiss 9, Doc. No. 80-1.) Here, they say, Clapp and Patterson provided specific information about the performance capabilities of Patterson's pumps – information upon which they know that the Design Defendants would rely, and "[a]s part of [the] allied set of project participants who had to rely on one another's information to successfully produce the project, Patterson and Clapp had a pecuniary interest in the project." (*Id.* at 10.)

The Court therefore must determine whether under Pennsylvania law, Section 552 liability can attach to Patterson and Clapp. The Court recognizes that Section 552 liability is not limited to design professionals. *See, e.g.*, *Precision Pipeline, LLC v. Trico Surveying & Mapping, Inc.*, No. 13-cv-1823, 2014 WL 4415378, at *2 (W.D. Pa. Sept. 8, 2014) (applying Section 552 liability to surveying company). Nevertheless, the Court cannot ignore that the Pennsylvania Supreme Court cited architects and design professionals as the prototypical examples of those who qualify as professionals who engage in supplying information to others for pecuniary gain. *See Bilt-Rite*, 866 A.2d at 285-86. Nor can the Court overlook that in doing so, the Pennsylvania Supreme Court noted that Pennsylvania common law allows the recovery in tort for economic losses for legal and accountant malpractice. *Id.* at 288.

With this in mind, it is clear that Patterson and Clapp are not in the business of supplying information, a necessary predicate to be subject to liability under Section 552. In the context of the project, Patterson manufactured a product, and Clapp facilitated the sale of that product. (Saylor Gregg Compl. ¶¶ 19, 20.) A manufacturer and a manufacturer's representative are very different from the accountants, lawyers, and architects noted in *Bilt-Rite*. The sale of a product is fundamentally different than the sale of information, even if the seller provides information about the product to consummate the sale. *See, e.g.*, *Pannetta v. Milford Chrysler Sales, Inc.*, No. 14-cv-05680, 2015 WL 1296736, at *7 (E.D. Pa. Mar. 23, 2015) ("[Allegations that defendant provided information to plaintiff attendant to the sale of a car] are insufficient to bring [plaintiff's] claims within the narrow exception to the economic loss doctrine.") (quotation omitted); *Partners Coffee Co., LLC v. Oceana Servs. & Prods. Co.*, 700 F. Supp. 2d 720, 735 (W.D. Pa. 2010) ("[I]t is abundantly clear from all the pleadings filed to date that Partners was not in the business of supplying information, but rather in the business of roasting and selling coffee."); *see also, e.g.*, *RLI Ins. Co. v. Indian River Sch. Dist.*, 556 F. Supp. 2d 356, 362 (D. Del. 2008) ("[Under Delaware law] where the information supplied is merely ancillary to the sale of a product or service in connection with the sale, defendant will not be found to be in the business of supplying information for the guidance of others in their business dealings.") (quotation omitted).

The Design Defendants' argument that Clapp and Patterson are subject to Section 552 liability would turn the exception into the rule. Many commercial transactions would fall under Section 552 and the *Bilt-Rite* exception and eviscerate the economic loss doctrine. The sale and purchase of a product often involves at least some conveyance of information from the seller.

9

Under the Design Defendants' articulation, if a third-party reasonably relied on that information, the seller would be liable in tort for purely economic damages.

Such a broad interpretation is inconsistent with authoritative case law referring to the *Bilt-Rite* exception as narrowly tailored. *See, e.g.*, *Azur v. Chase Bank, USA, Nat. Ass'n*, 601 F.3d 212, 223 (3d. Cir. 2010) ("The Pennsylvania Supreme Court crafted a narrow exception to the [economic loss] doctrine in *Bilt-Rite* . . . ."); *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 178 (3d Cir. 2008) ("[*Bilt-Rite*] carved out a narrow exception [to the economic loss doctrine] when losses result from the reliance on the advice of professionals."). The Pennsylvania Supreme Court has not adopted a broad view of Section 552 liability. It has adopted Section 552 only in the context of "professional information provider[s]" and has given "the architect/contractor scenario" as a specific example of a professional information provider. *Excavation Techs., Inc.*, 985 A.2d at 843; *Bilt-Rite*, 866 A.2d at 285. The Court will adhere to this narrow application.

The cases cited by the Design Defendants do not help their position. In *In re Brownsville Prop. Corp., Inc.*, No. 12-2029, 2013 WL 4010308, at *11 (Bankr. W.D. Pa. Aug. 11, 2013), the court found that real estate brokers are subject to Section 552 liability because they "are *in the business of conveying information* for the guidance of others in their business transactions." (emphasis added). Here, the Court finds that Patterson and Clapp are not in such a business. Additionally, *Bronster v. U.S. Steel Corp.*, 919 P.2d 294 (Haw. 1996) is an articulation of Hawaii state law and specifically held that Section 552 negligent misrepresentation actions under Hawaii law are not limited to parties whose business it is to supply information for the guidance of others. *Id.* at 311-12. The Pennsylvania Supreme Court in *Bilt-Rite*, however, specifically "adopt[ed] Section 552 as the law in Pennsylvania in cases where information is negligently

supplied by one *in the business of supplying information . . . .*" 866 A.2d at 287 (emphasis added). Consequently, the analysis of Hawaii law in *Bronster* is not only inapplicable, it is unpersuasive. Notably, the Design Defendants do not point to any case in which a court applying Pennsylvania law subjected a product manufacturer or sales representative to Section 552 liability because the manufacturer or sales representative provided product information attendant to the sale of the product.[2]

Finally, even if the economic loss doctrine did not bar the Design Defendants' claims against Patterson and Clapp, the factual allegations in the fourth-party complaint are insufficient to state a plausible claim for negligent misrepresentation against those parties. There are no factual allegations in the fourth-party complaint showing that Patterson and Clapp provided *any* representation upon which the Design Defendants reasonably relied when drafting the design drawings and specifications. The Design Defendants do not allege what information Patterson and Clapp provided to them, they do not allege how they used that information in developing the design specifications, they do not allege in what way this information was inaccurate, and they do not allege how the alleged inaccuracy caused the HVAC system to overflow.

The closest the Design Defendants get is an allegation that after the system failed, it took "weeks . . . before Patterson and Clapp admitted that there were problems intrinsic to the pumps." But this allegation does not support the Design Defendants' claim that Patterson and Clapp should be liable for the costs that ELCo incurred to do corrective work on the system, because any "representation" that Patterson and Clapp may have given in this regard necessarily occurred after the design documents were already drafted. As a result, the Design Defendants

---

[2] Other courts have noted that "Section 552 is poorly suited to a product sale." *Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 536 F. App'x 558, 567 (6th Cir. 2013) (quoting *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 746 (Ky. 2011)).

fail to state a claim against Patterson and Clapp for negligent misrepresentation.  The Design Defendants' complaint is dismissed as to those two parties.

An appropriate order follows.


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.