# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ELLIOTT-LEWIS CORPORATION** | |
| *Plaintiff,* | **CIVIL ACTION** |
| **v.** | **NO. 14-03865** |
| **SKANSKA USA BUILDING, INC.** | |
| *Defendant.* | |

**SKANSKA USA BUILDING, INC.**

      *Third Party Plaintiff,*

    **v.**

**SAYLORGREGG ARCHITECTS, URBAN ENGINEERS, INC., and MARVIN WAXMAN CONSULTING ENGINEERS, INC.**

      *Third Party Defendants.*

**SAYLORGREGG ARCHITECTS, URBAN ENGINEERS, INC., and MARVIN WAXMAN CONSULTING ENGINEERS, INC.**

      *Fourth Party Plaintiffs,*

    **v.**

**BONLAND INDUSTRIES, INC., DELTA COOLING TOWERS, INC., SASS MOORE & ASSOCIATES, INC., PATTERSON PUMP COMPANY, CLAPP ASSOCIATES, INC, and COMPREHENSIVE TEST & BALANCING, INC.**

      *Fourth Party Defendants.*

1

PAPPERT, J.                                                    MAY 4, 2015

### MEMORANDUM

This litigation involves a dispute regarding the installation of a new air conditioning system at the Franklin Institute ("Franklin") in Philadelphia (the "Project").  Elliott-Lewis Corporation ("ELCo"), a subcontractor on the Project, sued Skanska USA Building, Inc. ("Skanska"), the Project's general contractor, for unpaid work.  Skanska then sued the Project architects and engineers, SaylorGregg Architects ("SGA"), Urban Engineers, Inc. ("Urban") and Marvin Waxman Consulting Engineers ("MWCE") (collectively "Designers"), contending that anything it owes to ELCo is due to the Designers' negligent misrepresentations.  The Designers then sued a number of entities that supplied components and services for the Project ("Fourth-Party Defendants").  The Court dismissed from the case two of the Fourth-Party Defendants, Patterson Pump Company ("Patterson") and Clapp Associates, Inc. ("Clapp") because the economic loss doctrine barred the claims against them.  Another Fourth-Party Defendant, Comprehensive Test & Balance, Inc. ("CTB") now moves for judgment on the pleadings, also contending that the claims against it are barred by the economic loss doctrine.  The Court agrees and grants CTB's motion.

### I.

The Court's opinion granting Clapp and Patterson's motions to dismiss included a detailed explanation of the renovation project at Franklin and the factual background to this entire dispute.  *See Elliott-Lewis Corp. v. Skanska USA Bldg., Inc.*, No. 14-3865, 2015 WL 4545362 (E.D. Pa. July 28, 2015).  The Court discusses now only those facts pertinent to CTB's motion.

The Designers entered into an agreement with Franklin to provide architectural, mechanical, electrical, plumbing and fire protection engineering and design services for the

2

Project.  (Designers' Compl. ¶¶ 4–5, ECF No. 25.)  Part of the Project entailed the design and installation of a new heating, ventilating and air conditioning ("HVAC") system.  (*Id*. ¶ 14.) Franklin set April 1, 2013 as the milestone for the "Start of Cooling Season," and made February 22, 2013 the "target date for start up" of the HVAC system.  (*Id.* ¶ 15.)

ELCo, the subcontractor on the Project responsible for the HVAC system, chose not to use the two-cell cooling tower upon which the Designers based their designs.[1]  (*Id.* ¶¶ 33–35.)  It instead opted to use a four-cell cooling tower, which had "consequences as to the piping, controls and other related equipment" that needed to be used in order for the cooling tower to meet the Project's specifications.  (*Id.* ¶ 36.)  One of the Designers, MWCE, rejected ELCo's proposal for a four-cell tower because MWCE believed it would complicate the balancing of water in the cells, which was important to prevent any cell from overflowing.  (*Id.* ¶¶ 37–38.)

After ELCo and other subcontractors assured MWCE that the piping and related equipment could be configured to meet the Project's specifications, MWCE approved the four-cell tower.  (*Id.* ¶ 38.)  Due to a series of "events and errors" during the installation, however, the permanent cooling system was not ready for "start-up and testing" until March 28, 2013.  (*Id.* ¶ 41.)  During the start-up and testing process, some of the sumps for cells in the tower overflowed, flooding the roof on which it was placed.  (*Id.* ¶ 43.)  The receiving tank inside the building also overflowed.  (*Id.*)  As a result, the cooling tower did not work properly.  (*Id.* ¶ 45.) CTB was retained to "balance the system."  (*Id.*)  CTB "supplied data to MWCE and others as to the amount of water being pumped through . . . the various components of the systems, including the tower, for use by MWCE in its efforts to determine the cause of these problems."  (*Id.*)

---

[1]    The cooling tower sits on the roof and distributes chilled water throughout the building's interior to provide air conditioning.  (Designers' Compl. ¶ 27.)

After the problems with the cooling system persisted, MWCE discovered that the information that CTB provided, specifically the "flow data," was not accurate.  (*Id.* ¶ 47.)  It "determined that the actual flow through the system was much greater than had been indicated in the flow data provided by CTB."  (*Id.*)  At that point "additional work was done" and the system "was able to operate at its intended maximum capacity."  (*Id.* ¶¶ 48–49.)  During the time it took to repair the cooling system, ELCo installed temporary cooling equipment so that Franklin could open during the summer months while the permanent system was being repaired.  (ELCo Am. Compl. ¶ 33, ECF No. 33.)  Skanska did not pay ELCo for the additional work or for the cost of installing the temporary equipment.  (*Id.* ¶ 44.)

ELCo sued Skanska seeking to be paid for those additional costs.  (ECF No. 1.)  Skanska filed a third-party complaint against the Designers, alleging that ELCo only had to incur these additional costs because of their errors in designing the cooling system.  (Skanska Compl. ¶ 50, ECF No. 12.)  The Designers then filed a fourth-party complaint against the Fourth-Party Defendants.  (ECF No. 25.)  With regard to CTB, the Designers allege that "CTB was negligent in supplying the information it provided . . . and in not supplying it timely and accurately." (Designers' Compl. ¶ 52.)  They contend that "to the extent [Designers] have any liability to Skanska or ELCO . . . [it was] incurred due to the negligence, negligent misrepresentations and negligent supply of information and guidance by . . . CBT[.]"  (*Id.* ¶ 65.)

## II.

In their fourth-party complaint, the Designers made similar allegations against others involved in the HVAC installation, including Clapp and Patterson.  (ECF No. 25.)  Both Clapp and Patterson filed motions to dismiss predicated on the economic loss doctrine.  (ECF Nos. 67, 69.)  The Designers contended that the doctrine did not apply to Clapp or Patterson pursuant to

4

the Pennsylvania Supreme Court's decision in *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 285 (Pa. 2005), which set forth an exception to the economic loss doctrine. The court in *Bilt-Rite* adopted Section 552 of the Restatement (Second) of Torts, which "sets forth the parameters of a duty owed when one supplies information to others, for one's pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities." *Id.* at 285–86.

The Court dismissed the Designers' claims against Clapp and Patterson, holding that Clapp and Patterson "are not in the business of supplying information, a necessary predicate to be subject to liability under Section 552." *Elliott-Lewis Corp.*, 2015 WL 4545362, at *5. Rather, Patterson manufactured a product and Clapp facilitated its sale, which the Court found insufficient to bring the Designers' claims within the *Bilt-Rite* exception. *Id.* The Court stated that applying the exception to Clapp and Patterson would turn that exception into the rule.

CTB contends that the Designers' claims against it are "[n]o different tha[n] the claims against Clapp and Patterson[]" and are similarly "barred by the economic loss doctrine." (Mot. for J. on the Pleadings ("CTB Mot.") at 3, ECF No. 105.) It contends that CTB is not subject to the *Bilt-Rite* exception because it "was hired solely to provide a service; namely, balance the HVAC system following its installation by other contractors for more efficient operation of the installed HVAC system." (*Id.* at 5.) It maintains that "[a]ll information supplied by CTB after testing the HVAC system was ancillary to the services provided and cannot result in a finding of CTB being in the business of supplying information for the guidance of others in their business dealings." (*Id.* at 5–6.)

The Designers contend that CTB's "role and services for this project were <u>substantially</u> different from those of Patterson and Clapp." (Designers' Opp. to CTB Mot. at *6, ECF No. 106

(emphasis in original).)  They argue that because CTB provided balancing services and "information as to how the system was performing," it "falls within the scope of Section 552 and *Bilt-Rite.*"  (*Id.* at *6–7.)  The Court heard oral argument on the motion on February 26, 2016. (ECF No. 110.)

### III.

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is governed by the same standard as a motion to dismiss under Rule 12(b)(6).  *See Turbe v. Gov't of Virgin Is.*, 938 F.2d 427, 428 (3d Cir. 1991).

Accordingly, in deciding a motion for judgment on the pleadings, the Court "must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party."  *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005).  The plaintiff must articulate enough facts "to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  It is not enough for a plaintiff to allege mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.*  The plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  The Court "may disregard any legal conclusions."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

### IV.

Pennsylvania common law generally bars negligence claims that result solely in economic loss. *David Pflumm Paving & Excavating, Inc. v. Foundation Services Company*, 816 A.2d 1164, 1168 (Pa. Super. Ct. 2003) ("This Court has consistently denied negligence claims that cause only economic loss."). The Pennsylvania Supreme Court in *Bilt-Rite*, however, adopted Section 552 of the Restatement (Second) of Torts, which provides a narrow exception to this rule. 866 A.2d at 287. Section 552 states, in part, that:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Id.* at 272–73 n.1 (quoting Restatement (Second) of Torts § 552(1)).

In *Bilt-Rite*, defendant The Architectural Studio ("TAS") provided designs and specifications to be used by contractors in preparing bids for the construction of a new school. 866 A.2d at 272. TAS's designs stated that a certain portion of the project "could be installed and constructed through the use of normal and reasonable construction means and methods, using standard construction design tables." *Id.* Once construction began, however, the winning bidder, Bilt-Rite, discovered that the work required special construction methods "resulting in substantially increased construction costs." *Id.*

Bilt-Rite sued TAS on a theory of negligent misrepresentation under Section 552. TAS argued that Bilt-Rite's claims were barred by the economic loss doctrine. *Id.* at 272–73. After the trial court held that Section 552 did not apply to design professionals such as TAS, and the Superior Court affirmed, the Supreme Court reversed. It agreed with Bilt-Rite and adopted

Section 552 as a "narrowly tailored" exception to the doctrine. *Id.* at 286. It held that Section 552 applies to "cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons[.]" *Id.* at 287.

The contours of the *Bilt-Rite* exception were further defined in *Excavation Technologies, Inc. v. Columbia Gas Company of Pennsylvania*, 936 A.2d 111 (Pa. Super. Ct. 2007) (en banc), *aff'd*, 985 A.2d 840 (Pa. 2009). In that case, the court explained Section 552's applicability in the context of a construction project where "[a] design professional is typically responsible for the preparation of plans and specifications (information) that are supplied to and used by potential bidders in formulating a bid for a project." *Id.* at 115; *see also*, *Bilt-Rite*, 866 A.2d at 482 (stating that "design professional services play an important role in public and private planning"). The court explained that:

> The design professional is paid a fee for using his or her skills and training to provide information that is relied on by others prior to and during construction. If the plans and specifications prove to be erroneous, the contractor is at grave risk of suffering economic loss. Under these circumstances, it is quite clear that the design professional is supplying information in his or her professional capacity, as part of his or her business, for the guidance of others in a business transaction. Furthermore, a design professional's negligent misrepresentation could injure a third party in a variety of ways.

*Id.* at 116. The court held that plaintiff's claims were barred because the defendant, a public utility, "is not a defendant who is akin to the architect in *Bilt-Rite* who was a professional information provider." *Id.* It recognized that architects "have months or years to prepare detailed plans and drawings," whereas the public utility was merely responding to a request to mark gas lines in the vicinity of various work sites. *Id.*

The court stated that the Pennsylvania Supreme Court's adoption of Section 552 in *Bilt-Rite* was a "narrow exception . . . in the particular set of circumstances that were present in [that case]." *Id.* It further recognized that Section 552's application "was limited to design professionals, such as architects, because they have a contractual relationship with some party to the construction project, typically the owner, from which a duty flows to foreseeable third parties to that contract." *Id.* (citing *Davidson & Jones, Inc. v. New Hanover Cty.*, 255 S.E.2d 580, 584 (N.C. 1979)). The Supreme Court affirmed the lower court's holding in *Excavation Technologies* because the utility company did not fit within Section 552's scope even though it "enjoys an economic benefit from providing accurate information." *Excavation Techs.*, 985 A.2d at 842.

The *Bilt-Rite* exception to the economic loss doctrine is narrowly construed. *See, e.g.*, *Azur v. Chase Bank, USA, Nat. Ass'n*, 601 F.3d 212, 223 (3d. Cir. 2010) ("The Pennsylvania Supreme Court crafted a narrow exception to the [economic loss] doctrine in *Bilt-Rite* . . . ."); *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 178 (3d Cir. 2008) ("[*Bilt-Rite*] carved out a narrow exception [to the economic loss doctrine] when losses result from the reliance on the advice of professionals."); *Gongloff Contracting, L.L.C. v. L. Robert Kimball & Assocs., Architects & Engineers, Inc.*, 119 A.3d 1070, 1076 (Pa. 2015) ("However, a narrow exception is found in Section 552 of the Restatement (Second) of Torts . . . ."). Though there are some instances of courts applying Section 552 to professionals other than architects, "[s]ome courts have read *Bilt-Rite* to have an even more narrow application to only those negligent misrepresentation claims involving architects and similar design professionals." *Hults v. Allstate Septic Sys., LLP*, No. 06-0541, 2007 WL 2253509, at *9 (M.D. Pa. Aug. 3, 2007) (citing *Rock v. Voshell*, No. 05-1468, 2005 WL 3557841, *1 (E.D. Pa. Dec 29, 2005)).

In light of CTB's inherently different role from that of the design professionals contemplated by the Pennsylvania Supreme Court in *Bilt-Rite*, and given the *Bilt-Rite* exception's narrow construction, CTB does not fall within its scope.  Similar to Clapp and Patterson, CTB is not in the business of "supplying information" within the meaning of Section 552.  CTB was not an architect or design professional who prepared the specifications and plans for the Project; nor was it a contractor supplying information to others prior to the Project's commencement.  CTB was hired to perform a service: it was brought in after installation of the permanent cooling system to help fix or "balance" it.  (Designers' Compl. ¶ 45.)

In response to CTB's argument that any representations it made "were provided long after the initial design documents were drafted," (CTB Mot. at 5), the Designers cite to *Gongloff*, 119 A.3d at 1070.  They argue that *Gongloff* stands for the proposition that a plaintiff may sustain a negligent misrepresentation claim under Section 552 for representations "made during the course of performance of a contract."  (Designers' Opp. to CTB Mot. at *9.)  *Gongloff*, however, involved facts that were typical of a claim within Section 552's scope: a lawsuit by a subcontractor against an architect for negligent misrepresentations made in its design of a structure that was supplied to all contractors and subcontractors on the project.  119 A.3d at 1072.  Contrary to the Designers' suggestion, it did not involve a defendant like CTB who was retained during the construction to troubleshoot one aspect of the project.  *Gongloff* is further distinguishable because it involved claims against an architect, which "clearly qualifies as a design profession 'in the business of supplying information[.]'"  119 A.3d at 1079.

Further, the Designers' attempt to distinguish CTB from Patterson and Clapp by describing CTB's assignment as "provid[ing] balancing services and information as to how the system was performing."  (Designers' Opp. to CTB Mot. at *6.)  Such a description purportedly

allows the Designers to contend that Section 552 applies because "CTB was 'in the business of conveying information for the guidance of others.'" (*Id.*) It does not follow, however, that merely being a seller of services rather than a seller of products automatically places a defendant within Section 552's scope. To the contrary, it is well-recognized that the economic loss doctrine can apply "outside of the products liability realm to cases involving negligence in the performance of services contracts." *Hults*, 2007 WL 2253509, at *7 (holding that economic loss doctrine barred claims against septic tank repair company because it did not fall within the scope of the *Bilt-Rite* exception) (citing, *inter alia*, *Nufeeds, Inc. v. Westmin Corp.*, No. 04-1071, 2006 WL 1000021 (M.D. Pa. Apr. 17, 2006)). The dispositive issue in determining Section 552's applicability is therefore not whether CTB sold a service versus a product, but whether the service CTB delivered was to provide information in the same manner as an architect or design professional. As a contractor hired after the commencement of the Project to repair—or "balance"—the cooling system, CTB does not fall into that category.

The Designers also argue that questions surrounding CTB's precise role are factual issues which require the Court to deny CTB's motion. (Designers' Opp. to Defs.' Mot. at *8.) They contend that the complaint's allegations that CTB supplied information on which the design professionals relied "are adequate to sustain the negligent misrepresentation claim." (*Id.* at *8–9.) That CTB supplied information in the performance of its services does not mean that it is "in the business of supplying information, [like] an architect or design professional." *Bilt-Rite*, 866 A.2d at 287. Permitting a plaintiff to proceed based on claims that the defendant "supplied information"—which many service arrangements entail—would vastly expand *Bilt-Rite* beyond its intended limits. CTB is not the type of architect or design professional envisioned by *Bilt-Rite*, nor can its services be described as "in the business of supplying information." The *Bilt-*

*Rite* exception does not apply to CTB and the claims against it are barred by the economic loss

doctrine.

An appropriate Order follows.


BY THE COURT:


**_/s/ Gerald J. Pappert_**
GERALD J. PAPPERT, J.